# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| ALAINER MOORE, o/b/o | ) | |
| DIAMOND MOORE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-0495-CV-W-NKL |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Pending before the Court is Alainer Moore's Motion for Summary Judgment [Doc. # 12]. Alainer Moore pursues this action on behalf of her daughter, Diamond Moore ("Diamond"). Moore seeks judicial review of the Commissioner's denial of her request for disability benefits that she submitted under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*.

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Following a review of the entire record, the Court finds that the ALJ's decision was not supported by substantial evidence in the record.

## I.    Background

Diamond was born December 25, 1997. Diamond's mother filed an application for disability benefits on her behalf on March 13, 2002, wherein she alleged that Diamond

1

was disabled as of the date of her birth.  (Tr. 38-41.)

A.     **Medical Evidence**

On February 14, 2002, Diamond was treated at the Emergency Room at Children's Mercy Hospital in Kansas City for a "severe flare of her asthma."  (Tr. 99.)  According to the instructions provided by the hospital, Diamond's flare occurred because she ran out of medicine.  The instructions advised Diamond's mother to take her to a doctor within the next 1-2 days for treatment, but there is no evidence that follow-up treatment occurred.

On May 10, 2002, Diamond was assessed for a disability by Dr. Jackie Tenney.  (Tr. 110-13.)  Dr. Tenney determined that Diamond had "persistent" asthma with regular attacks, but that it was controlled by medication.  Regarding whether Diamond was hyperactive, Dr. Tenney stated, "Based on this evaluation there is no evidence of Attention Deficit Disorder.  Her age is also inconsistent with this diagnosis.  She does have some precursors to this condition and will need further evaluation."  (Tr. 112.)  In sum, Dr. Tenney concluded, "[Diamond] is able to function normally in age-appropriate activities in an independent manner."  (Tr. 113.)

On May 17, 2002, Dr. Linda Nixon filled out a Childhood Disability Evaluation Form regarding Diamond.  (Tr. 118-21.)  Dr. Nixon identified Diamond's only impairment as asthma and she stated that Diamond exhibited "no evidence of hyperactivity."  (Tr. 121.)  Regarding Diamond's asthma, Dr. Nixon stated that it was controlled with medication.  Dr. Nixon concluded that Diamond's impairment was non-severe.

Case 4:05-cv-00495-NKL   Document 14   Filed 06/20/06   Page 2 of 10

In December 2003, an intake evaluator at the Truman Medical Center ("TMC") stated that Diamond had attention-deficit hyperactivity disorder ("ADHD") and that she should receive a psychiatric evaluation from the TMC Medical Clinic. (Tr. 174.) The intake assessor noted that Diamond's mother had refused psychiatric services offered through the school. The evaluator observed that "Diamond is fidgety, hyper and impulsive." (Tr. 170.) In early 2004, evaluators at TMC diagnosed Diamond with ADHD. (Tr. 157-65.)

On May 6, 2004, a children's services client contact form reflected that Diamond was compliant with her medication and she was "not hyperactive anymore, but still gets easily distracted and inattentive." (Tr. 161.)

### 1.    Dr. Boraks - WISC-III

On June 3, 2004, Dr. Franklin Boraks, a clinical psychologist, performed a psychological evaluation of Diamond at the request of her attorney. (Tr. 177-78.) Dr. Boraks administered the Wechsler Intelligence Scale-Children III ("WISC-III"). Dr. Boraks concluded that Diamond had a verbal IQ score of 63, a performance IQ score of 60, and a full scale IQ score of 58. He diagnosed her with mild mental retardation and ADHD. Dr. Franks concluded that the test results were valid because "there appears to be sufficient investment in testing tasks." (Tr. 178.)

### 2.    Prestage - WISC-IV

On August 6, 2004, Jamie Prestage ("Prestage"), a licensed psychologist, performed an assessment at the request of the Commissioner. (Tr. 183-86.) Prestage

observed Diamond and administered the Wechsler Intelligence Scale-Children IV ("WISC-IV"). Prior to the appointment, Diamond had not taken her ADHD medication and she "exhibited an increased level of motor activity." (Tr. 184.) Diamond's "attention and concentration were very poor" and she demonstrated "poor effort and motivation." (Tr. 184.)

Diamond's performance on the WISC-IV was considerably better than her performance on the WISC-III. She obtained a full scale IQ score of 71, a verbal comprehension index score of 81, a perceptual reasoning index score of 71, a working memory index score of 74, and a processing speed index score of 80. (Tr. 185.)

Prestage concluded that "Diamond continues to exhibit delays in her expressive and receptive language skills. In addition, she exhibits numerous articulation errors and her speech at times is unintelligible." (Tr. 185.) Although Prestage believed that Diamond's full scale IQ score was "an underestimation of her abilities" she nonetheless stated that Diamond functioned in the "borderline range of general intelligence." (Tr. 185.) Prestage stated that Diamond's behavior was consistent with a diagnosis of ADHD. (Tr. 186.) Prestage concluded that Diamond was "unable to engage in age appropriate activities in an independent manner on a sustained basis." (Tr. 186.)

**B.    School Records**

Diamond's school records from 2004 reflect that she was continuing to have problems at her school. (Tr. 78-87.) The 2003-2004 school year was Diamond's kindergarten year of school. From March 5, 2004 to April 20, 2004, she was written up

4

for five conduct violations.  All of the violations related to Diamond fighting with and acting violently toward other students.  On March 22, she was given a one day suspension.  (Tr. 80.)  On April 14, she was given a two-day suspension.  (Tr. 79.)  On April 20, Diamond's teacher stated that she "was out of control" and she attacked another student.  (Tr. 78.)  Although Diamond had demonstrated some improvement in most areas of her school performance, her teacher still requested a conference with Diamond's mother because her behavior was "unacceptable."  (Tr. 87.)

### C.     The ALJ's Decision

After a hearing in May 2004, the ALJ denied Diamond's application for benefits. (Tr. 12-20.)  The ALJ discounted the IQ findings of Dr. Boraks and instead relied on the IQ determinations reached during Prestage's evaluation.  The ALJ stated, "In order for the IQ tests to be so radically different, it is impossible to believe that the claimant would have suddenly found additional mental capacity for the second evaluation.  It is more likely that, for some reason, the claimant, in some fashion, suppressed her capability in the Boraks evaluation."  (Tr. 13.)  He concluded, "It is more likely that the score obtained by Prestage is accurate."  (Tr. 13.)

While the ALJ gave credence to the IQ results reached by Prestage, he did not give any weight to her conclusion about Diamond's capabilities.  The ALJ stated:

> As to the conclusions of Ms. Prestage, it is noteworthy that much of her information was taken from the claimant's mother.  In the hearing, the mother, although on SSI herself supposedly because of low IQ, was articulate and knew exactly what she was saying and doing.  The claimant's mother has already guided four of her other nine children into SSI benefits,

5

and she continues to understand what facts it might take to convince one as to disability. The [ALJ] finds that Ms. Prestage's conclusions as to diagnosis--that is, developmental delays in speech and language and borderline intelligence--are valid. However, the analysis as to the application of these problems is based on the mother's reports and activity demonstrated by the child that is not observed elsewhere to the extent the mother contends.

(Tr. 14.) Thus, the ALJ gave weight to Prestage's test scores, but not her application of those test scores to Diamond's specific condition because he did not find Diamond's mother to be credible.

In the domain of acquiring and using information, the ALJ noted that Diamond's school threatened to report her mother to the State because she refused to consent to treatment through the school. The ALJ stated, "The apparent failure of the claimant's mother to pursue such assistance for her daughter significantly undermines her credibility. In addition, the psychiatric treatment records describe the claimant's mother as hostile and defensive. And as noted above, the medical evidence of record refers repeatedly to poor medication compliance by the mother with regard to the claimant's asthma." (Tr. 17.)

Regarding the domain of attending and completing tasks, the ALJ stated:

In this domain, the claimant has less than "marked" limitations. At the May 2004 hearing, the claimant's mother testified that the claimant has had some problems in completing tasks at home. On the other hand, the record suggests that the claimant has had little relevant direction at home. Notably, psychiatric treatment records describe the claimant's household as chaotic. The claimant's school records support a finding that continued socialization at school will help the claimant in improving her ability to maintain attention and concentration, as would adequate mental health treatment.

6

(Tr. 17.)

The ALJ conceded that Diamond had a "marked" limitation in the domain of interacting and relating with others. (Tr. 18.) However, he discounted that finding because of Diamond's mother. Noting Diamond's problems in school, the ALJ stated:

> The record nevertheless shows no pursuit of mental health treatment until December 2003, almost two years after the instant application for [SSI] benefits was filed, a circumstance that casts additional doubt upon the mother's credibility.

(Tr. 18.) The ALJ found that Diamond had less than marked limitations in the areas of self-care and her physical well-being, with the latter being based on the fact that her asthma was controlled by medication.

## II.     Discussion

The issue in this case is whether Diamond qualifies for benefits under either Listing § 112.05C or Listing § 112.05D. Listing § 112.05C requires a valid verbal, performance, or full scale IQ score of 59 or less. Listing § 112.05D requires a valid verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of functioning. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ found that Diamond did not qualify for benefits under either Listing. The ALJ decided to disregard Diamond's IQ results that were formulated during the evaluation by Dr. Boraks. Those test results yielded a full scale IQ score of 58, which would have brought her within the parameters of Listing § 112.05C. The ALJ's decision

7

is not supported by substantial evidence in the record.

The ALJ failed to explain why he was discounting Dr. Boraks's results. Instead, he speculated that Diamond had somehow manipulated the results when he stated, "It is more likely that, for some reason, the claimant, in some fashion, suppressed her capability in the Boraks evaluation." (Tr. 13.) This was the sum total of the ALJ's analysis and he did not explain how a six year old would have had the sophistication and intellect to minimize her efforts during the IQ test which is administered by a professional. The ALJ's inference that Diamond intentionally had "suppressed" her capabilities in the Dr. Boraks's evaluation is unfounded.

While there is some reference to Diamond's lack of concentration during the examination, that factor alone did not call into question the validity of the test results. Dr. Boraks stated the results were valid because "there appears to be sufficient investment in testing tasks." (Tr. 178.) The ALJ did not reconcile his conclusion with Dr. Boraks's conflicting opinion that the test results were valid. There is nothing in the record to suggest that Diamond manipulated the validity of the IQ test results and the ALJ's decision to the contrary is based on conjecture rather than objective evidence.

Similarly, the ALJ's decision to adopt the IQ testing from Prestage's evaluation but reject her finding that Diamond's behavior was consistent with ADHD and she was "unable to engage in age appropriate activities in an independent manner on a sustained basis" is not supported by substantial evidence. (Tr. 186.) Prestage's conclusion was the result of both her observation of Diamond and the reports from Diamond's mother. Thus,

8

both Diamond's expert and the Commissioner's expert agreed that Diamond was limited and that her functioning was seriously impaired.

The ALJ adopted the IQ score rendered by the Prestage evaluation but not Prestage's conclusion because he did not believe that Diamond's mother was credible. To support his assessment, the ALJ noted that several of Diamond's siblings were also receiving benefits, the mother's home was considered "chaotic," the mother declined the services provided by Diamond's school, and the mother was not fully complying with Diamond's medication regimen for her asthma.

These examples of alleged lack of credibility are grounded in the ALJ's subjective impressions of Diamond's mother rather than objective evidence in the record. The ALJ does not point to specific objective evidence in the record that undermines the mother's statements about Diamond. Diamond's ADHD was diagnosed by other sources and the IQ tests, at best, demonstrate that she operates at a borderline range of intellect functioning. Evidence from her school is also consistent with the expert's conclusions. Taken together, this evidence suggests that Diamond's mother is not fabricating the severity of Diamond's condition and instead suggests that the symptoms observed by Diamond's mother are accurate. While the ALJ's observations about Diamond's mother may go to her fitness as a parent, they do not suggest that her statements about Diamond were not reliable.

Because there is not substantial evidence in the record to support the ALJ's finding, it is reversed.

9

**III. Conclusion**

Accordingly, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 12] is

GRANTED.  The decision of the ALJ is REVERSED and the Commissioner is ordered to

pay benefits.


                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

DATE:  June 20, 2006
Kansas City, Missouri